JON M. SANDS
Federal Public Defender
**WALTER I. GONÇALVES, JR.**
Assistant Federal Public Defender
State Bar No. 023659
407 W. Congress St., Suite 501
Tucson, AZ 85701
Telephone: (520) 879-7500
*walter_goncalves@fd.org*
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR19-0471-TUC-RM (LAB) |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| vs. | |
| Leonid Cornejo. | |
| Defendant. | |

**I.  Introduction**

Leonid Cornejo will appear before the court for sentencing on August 26, 2020. The court should impose a sentence of 24 months, followed by a term of supervised release. As Mr. Cornejo has 581 days of pre-trial incarceration, 24 months[1] sentence hopefully means time served.[2]

**II.  A sentence of 24 months is enough but not greater than necessary to follow the purposes of federal sentencing**

   *A.  The history and characteristics of the defendant*

---

[1] The U.S. Sentencing Guidelines are only advisory. United States v. Booker, 543 U.S. 220 (2005). A 24 months sentence is lower than the guideline recommended by the U.S. Probation Department. Nonetheless, there are good reason to vary downward substantially. As this memo explains, Mr. Cornejo's neglected childhood, with difficult experiences in poor environments in Nogales, Mexico, and Queens New York.

[2] This assumes he receives 108 days of "good time" credits for 24 months in prison. *See* 18 U.S. Code § 3624 (prisoner may receive credit toward the service of sentence of up to 54 days for each year of the sentence imposed by the court).

1

Mr. Cornejo is a 24-year-old Hispanic man born in Phoenix, Arizona. His mother is from Mexico, his father from Lima, Peru. Mr. Cornejo's maternal grandparents raised him. He lived with them until he was 16 years old. Then he moved to New York City to live with his father. He lived in Queens for 2 years and then moved to New Orleans to live with his then girlfriend, Jocelyn Galvan-Felix, in 2016. Their daughter, Khaleesi Cornejo, is four years old. The couple moved to Tucson to be closer to family. Due to Mr. Cornejo's incarceration, the couple is not together anymore, having ended their relationship in 2019 amicably. There is no child support order for Khaleesi. Mr. Cornejo wants to support his daughter as best he can.

Mr. Cornejo only became acquainted with his mother at age 14. His mother and father were involved in criminal activity, causing the maternal grandparents to step in after the Department of Child Safety became involved. But the grandparents also had trouble and engaged in domestic violence, which Mr. Cornejo saw.

Mr. Cornejo worked at Desert Diamond Casino only for two weeks. Before that he worked for Valerios Brothers as a landscaper. He has experience as construction worker and laborer in the fields.

Unfortunately, Mr. Cornejo has a prior conviction from Pima County Superior Court for theft. There he admitted to taking jewelry from a residence he worked in while employed for a moving company. Law enforcement arrested him after he tried to pawn the jewelry, after police notified the owner and she found the property. Judge Teresa Godoy placed him on probation. He faces revocation after completing this case. Mr. Cornejo reported to the Pima County Probation Department that as a teenager he found an uncle dead in a bathroom due to a drug overdose. When he lived in Tucson with Ms. Galvan, one of her uncles owned or rented a property they shared and forced Mr. Cornejo out because he did not like him. Mr. Cornejo slept in a car outside the residence for a period because of this.

Mr. Cornejo only attended school to the 11th grade in Queens. The school placed him in English as second language and special education classes. He wants to live in

Nogales, Sonora after release from federal custody. He is welcome to live with his maternal grandmother.

### B. *The nature and circumstances of the offense*

On January 23, 2019 Mr. Cornejo and the co-defendant tried to enter Mexico with ammunition and firearms. Customs and Border Protection Officers found two disassembled rifles, one pistol, and 2,030 rounds of ammunition hidden in the pickup truck Mr. Cornejo drove. The disassembled rifles were laying on the driver and front passenger seat beneath a thin cover. Mr. Cornejo sat on top of the rifle parts. During a confession Mr. Cornejo said he expected to receive $880.00 to smuggle the weapons and ammunition to Mexico.

### C. *Seriousness of the offense, respect for the law, and just punishment*

This section of 3553(a)(2)(A) needs consideration only of the defendant's past actions, not his probable future conduct nor the effect that the punishment might have on crime rates or otherwise. *See* Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005) (emphasis supplied). It needs the court to consider retribution, or an examination of the actor's blameworthiness for his past actions. *Id.*

The court must consider the nature and seriousness of the harm caused or threatened by the crime, the offender's culpability, intent, motives, role in the offense, and mental illness or diminished ability. *See* Amy Baron Evans et al., Federal Defenders of San Diego, Inc., Defending a Federal Criminal Case, 17-775, 17-804 (2010). Other factors that decrease the seriousness of the offense include whether biological or psychological impairments diminished his knowledge or intent; if the offense resulted from a disadvantaged upbringing; abuse, poverty, addiction, mental illness; if the defendant's gain from the offense was minor; or if restitution was paid in whole. *Id.*

The gain from the offense was minor compared to the wealth drug and weapons cartels make daily in Mexico and the United States.[3] Cartel members recruited Mr. Cornejo because he did not have a decent job, had low educations skills, and, frankly, had been involved in petty crime. He is hardly a dangerous person, and of little value to a drug cartel.[4] Mr. Cornejo owed a $1,500.00 debt. The cash found in his possession, $1,200.00 USD, was mostly his uncle's ($1,000.00). The remaining $200.00 he earned from work.

### D. Deterrence and protection of the public
#### i. General deterrence

Empirical research shows no relationship between sentence length and deterrence. *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28 (2006) and Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999). Potential criminals are not aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentence consequences in the manner one might expect of rational decision makers. *Id*. "There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." *See* Gary Kleck et al, *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005).

These principles apply well at the border, where large numbers of underprivileged Mexicans and Americans make quick money as couriers and street-level sellers in the

---

[3] See Mexico cartels: Which are the biggest and most powerful? BBC News, (October 24, 2019), https://www.bbc.com/news/world-latin-america-40480405 (The Sinaloa drug cartel continues to make billions of dollars from trafficking illicit narcotics to the US, Europe and Asia, experts say). The weapons in this case could have headed to other cartels, but the Sinaloa cartel controls the territory next to Arizona.

[4] See American Guevara, *Propaganda in Mexico's Drug War*, 6 J. Strategic Sec. 131, 139 (2013) ("Low-level recruits are those who work directly for the cartels as lookouts, drug dealers, sicarios (hitmen), and mules. Drug traffickers entice these individuals with the world's strongest motivator: money.").

drug trade. The U.S. government will not curb the outflow of firearms from the United States nor within it by increasing prison sentences. The best way to reduce gun crimes in this part of the country is to invest cultural capital in disadvantaged communities. This does not guarantee the end of all gun crimes but is a significant step in reducing it.

*ii.    Specific deterrence*

Section 3553(a)(2)(C) needs the judge to consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." This purpose concerns both the defendant's risk of recidivism and the danger posed by the defendant, if any. It "is particularly important for those offenders whose criminal histories show repeated serious violations of the law." S. Rep. No. 98-225 at 76 (1983). It is not so important for first offenders, for those with insignificant risk of recidivism, for those whose prior offenses are minor or non-violent, or for those who have a strong potential for rehabilitation, through treatment they have never received.

Although Mr. Cornejo had a prior conviction for theft and was on probation when he committed this act, Pima County Superior Court will find him in revocation and more than likely impose a prison sentence. This is; however, the first time any court has imprisoned Mr. Cornejo. It has left an indelible mark on him. His brother died while he was in custody and he could not be present for family members to mourn his passing. He has lost two years of time away from his young daughter. Further, he has experienced the difficulty of being in prison during the time of COVID-19.[5] These are specifically deterring for Mr. Cornejo not to be involved in crime after release from custody. More prison time than 24 months in unnecessary.

**III.    Unconscious racism**

---

[5] *See* Brendan Saloner, et al. *COVID-19 Cases and Deaths in Federal and State Prisons*, JAMA (Journal of the American Medical Association, Research Letter Published July 8, 2020, available at https://jamanetwork.com/journals/jama/fullarticle/2768249 (inmates in jails and prison are 5.5 more likely to contract the virus and that the age/sex-adjusted death rate is 3.0 times higher compared to the general population).

One purpose of federal sentencing is the imposition of fair and just sentences. A consideration of empirically sound social science research is therefore proper. Most empirical research on racial and ethnic bias in criminal courts focuses on African Americans. But several studies outside of the criminal justice context conclude that people perceive Latinxs as less intelligent compared to other ethnicities (including Latinxs themselves). *See* James M. Weyant, *Implicit Stereotyping of Hispanics: Development and Validity of a Hispanic Version of the Implicit Association Test*, 27 Hisp. J. Behav. Sci. 355, 358-62 (2005).

In another study, primary health care professionals held negative implicit racial biases against Latinx patients. *See* Irene V. Blair et al., *Assessment of Biases Against Latinos and African Americans Among Primary Care Providers and Community Members*, 103 Am. J. Pub. Health 92 (2013). Finally, a third study concluded that foreign defendants serve more time in prison compared to U.S. citizens for the same offenses. *See* Michael T. Light et al*., Citizenship and Punishment: The Salience of National Membership in U.S. Criminal Courts*, 79 Amer. Soc. Rev. 825, 827-849 (2014). It is therefore not a stretch to conclude that criminal justice professionals hold implicit biases against Latinxs.

Mr. Cornejo's ethnicity was more than likely a disadvantage to him during phases of his criminal case. Defense counsel respectfully asks the court to consider the effects of implicit bias in deciding Mr. Cornejo's sentence.

Implicit bias plays a factor in the minds of white and minority defense lawyers, prosecutors, judges, probations officers, and pre-trial services officers. Although few individuals have no implicit bias against darker skinned or indigenous individuals, this is impossible to find without the person taking the Implicit Association Test, available at the Harvard University's Psychology Department website: http://www.implicit.harvard.edu; see also Project Implicit, Implicit Association Test (IAT), http://projectimplicit.net/nosek/iat/.

The American Bar Association has also published resources helpful to judges and lawyers, including an instructional video:

- https://www.americanbar.org/publications/youraba/2016/september-2016/strategies-on-implicit-bias-and-de-biasing-for-judges-and-lawyer.html
- https://www.americanbar.org/news/abanews/aba-news-archives/2016/02/hidden_injusticebi.html

Social scientists, law professors, a federal judge, and defense lawyers have also contributed to this knowledge base:

- Jeffrey J. Rachlinski et. al., *Does Unconscious Racial Bias Affect Trial Judges?* 84 Notre Dame L. Rev. 1195 (2009) (while implicit biases exist in all populations including the judiciary, judges seem aware of the potential for bias in themselves and have the cognitive skills to avoid its influence).
- Justin D. Levinson et. al, *Judging Implicit Bias: A National Empirical Study of Judicial Stereotypes*, 69 Fla. L. Rev. 63 (2017) (finding anti-Asian and anti-Jewish implicit biases among federal and state judges, and considering the results in white-collar criminal sentencing).
- Jerry Kang, et. al., *Implicit Bias in the Courtroom*, 59 UCLA L. Rev. 1124 (2012) (explaining that decisions are influenced by "a long litany of biases").
- Mark W. Bennett & Victoria C. Plaut, Lo*oking Criminal and the Presumption of Dangerousness: Afrocentric Facial Features, Skin Tone, and Criminal Justice*, 51 U.C. Davis L. Rev. 745 (2018) (discussing historical preconceptions about skin tone across both Western and non-Western cultures).
- Mark W. Bennett, *The Implicit Racial Bias in Sentencing: The Next Frontier*, 126 Yale L.J. Forum 391 (2017) (instructing judging and implicit bias at sentencing)

These studies show that implicit bias affects all minority defendants. Most of the research focuses on African-Americans but it affects other minorities also.

**IV.    Conclusion**

Considering the facts and circumstances, a sentence of 24 months followed by a term of supervised release is enough but not greater than necessary to satisfy the sentencing goals of punishment, deterrence, and protection of the public.

//

//

| | |
|---|---|
| 1 | RESPECTFULLY SUBMITTED this 17th day of August 2020. |

<br>

                                      JON M. SANDS
                                      Federal Public Defender

*s/ Walter I. Gonçalves, Jr.*
WALTER I. GONÇALVES, JR.
Assistant Federal Public Defender

Copy of the foregoing has been provided
by electronic transmittal via the CM/ECF System:

Angela Woolridge,
Assistant United States Attorney